MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:    2014 ME 22
Docket:      Aro-12-528
Argued:      June 11, 2013
Decided:     February 13, 2014

Panel:       SAUFLEY, C.J., and LEVY, SILVER, MEAD, and JABAR, JJ.
Majority:    SAUFLEY, C.J., and LEVY, and MEAD, JJ.
Dissent:     SILVER, and JABAR, JJ.

ESTATE OF VERA BOULIER

v.

PRESQUE ISLE NURSING HOME


LEVY, J.

[¶1]  The Estate of Vera Boulier appeals from a judgment entered in the Superior Court (Aroostook County, *Hunter, J.*) in favor of Presque Isle Nursing Home (PINH), following a jury's determination that PINH was not liable for Boulier's death, which resulted from a fall on PINH's premises.  The Estate contends that the court erred in excluding evidence of remedial measures taken by PINH after Boulier's fall, and in rejecting the Estate's proposed jury instructions. We affirm the judgment.

## I.  BACKGROUND

A.    Boulier's Fall on PINH's Premises

[¶2]  This action arises from the death of Vera Boulier, who died at the age of eighty-five as a result of injuries she sustained from a fall while she was a

resident at PINH. As it does for each resident in its care, PINH had developed a care plan for Boulier, who had resided at the facility since 2006. A care plan is the individualized "blueprint" that instructs PINH's staff as to each resident's needs. The care plan PINH created for Boulier accounted for her high susceptibility to falls and was regularly updated to reflect her condition and to inform PINH's staff of the level of assistance she required. On the morning of Boulier's fall, her care plan stated that she required "one assist" when going to and from the toilet.

[¶3] Boulier routinely left her bed several times per night to use the bathroom, often without requesting assistance. Absent a physician's order, PINH cannot restrain its residents to prevent them from leaving their beds. Instead, it uses automated bed alarms to alert the staff when a resident gets out of bed during the night.

[¶4] Early in the morning of January 16, 2009, Wendy Charette[1] was the certified nurse's aide (CNA) assigned to Boulier's care. Charette heard Boulier's bed alarm sound, went to check on her, and found Boulier seated on the toilet in the bathroom. This was a frequent occurrence for Charette, who had cared for Boulier for approximately two years. Charette understood the "one assist" directive in Boulier's care plan to mean that when Boulier was using the toilet, the

---

[1] At the time of the events giving rise to this case, Wendy Charette's name was Wendy Poulin.

attending CNA was to stay in the vicinity of the bathroom and assist Boulier as necessary while also respecting her privacy.

[¶5]  When she found Boulier in the bathroom on the morning of January 16, Charette did not have sanitary gloves on her person or immediately within reach. Charette asked Boulier to stay where she was so that Charette could retrieve a pair of gloves.  Boulier nodded, and Charette stepped out of the bathroom to retrieve gloves from a dispenser located approximately five to six feet from the entrance to the bathroom.  While Charette was retrieving the gloves, Boulier fell and struck her face on a trashcan, sustaining a serious laceration.  Boulier was immediately hospitalized, and died from her injuries about one week later.[2]

B.    Notice of Claim and Prelitigation Screening Panel

[¶6]  In May 2009, Boulier's estate commenced an action against PINH for professional negligence in accordance with the Maine Health Security Act (MHSA), 24 M.R.S. §§ 2501-2987 (2009).[3]  As required by the MHSA, the Estate filed a notice of claim in the Superior Court naming PINH as the defendant.  *See* 24 M.R.S. § 2903(1)(A).  The notice of claim asserted that PINH "negligently treated" Boulier; "that the negligence consists of, but is not limited to leaving . . .

---

[2]  The parties stipulated that Boulier died as a result of complications from her fall.

[3]  The Maine Health Security Act, 24 M.R.S. §§ 2501-2987 (2009), has since been amended in ways not relevant to the disposition of this appeal.  *See, e.g.*, P.L. 2011, ch. 190, § 1 (effective Sept. 28, 2011) (codified at 24 M.R.S. § 2502(1-A) (2013)).

Boulier alone in the bathroom"; and that PINH's negligence caused Boulier's death.

[¶7] The Estate presented its case to a mandatory prelitigation screening panel, in accordance with 24 M.R.S. § 2854(1).[4] Although the record does not definitively establish the theories of liability that the Estate presented to the screening panel, it does establish that the panel reviewed the deposition transcript of Sandra LaPorte, R.N., the Estate's expert witness. In her deposition, LaPorte expressed criticism regarding Charette leaving Boulier alone in the bathroom, and PINH failing to have gloves or a call bell available in Boulier's bathroom. When counsel for PINH asked LaPorte if she had any other criticisms of the care PINH provided to Boulier, LaPorte responded that she could not answer the question

---

[4] Title 24 M.R.S. § 2854(1) provides:

> **Procedure.** The claimant or a representative of the claimant shall present the case before the panel. The person accused of professional negligence or that person's representative shall make a responding presentation. Wide latitude must be afforded the parties by the panel in the conduct of the hearing including, but not limited to, the right of examination and cross-examination by attorneys. Depositions are admissible whether or not the person deposed is available at the hearing. The chair shall make all procedural rulings and those rulings are final. The Maine Rules of Evidence do not apply. Evidence must be admitted if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs. The panel shall make such findings upon such evidence as is presented at the hearing, the records and any expert opinions provided by or sought by the panel or the parties.

> After presentation by the parties, as provided in this section, the panel may request from either party additional facts, records or other information to be submitted in writing or at a continued hearing, which continued hearing must be held as soon as possible. The continued hearings must be attended by the same members of the panel who have sat on all prior hearings in the same claim, unless otherwise agreed by all parties.

without knowing whether Charette "[had] the information that she needed to provide the care to Ms. Boulier." Counsel for PINH responded that he would "include that in our list that we've been making as we go along here."

[¶8] Following the presentation of the evidence, the screening panel made findings regarding liability pursuant to 24 M.R.S. § 2855(1) that are not part of the record.

## C. PINH's Motion in Limine

[¶9] Following the screening panel's determination, the Estate filed a complaint in the Superior Court alleging PINH's negligence and requesting a jury trial. Prior to trial, PINH filed a motion in limine to exclude evidence that it had installed glove dispensers in its residents' bathrooms after Boulier's fall occurred. PINH stated in its motion that, at trial, it would not controvert the feasibility of installing glove dispensers. The court granted PINH's motion on the ground that evidence regarding the installation of glove dispensers in the bathroom of each resident constituted inadmissible evidence of subsequent remedial measures pursuant to M.R. Evid. 407.[5]

---

[5] Maine Rule of Evidence 407 provides, in relevant part:

SUBSEQUENT REMEDIAL MEASURES; NOTIFICATION OF DEFECT

*(a) Subsequent remedial measures.* When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove

6

D.    Jury Trial

[¶10]    A jury trial was held in September 2012.  At trial, the Estate introduced in evidence an incident report composed by PINH shortly after Boulier's fall.  The report briefly described how Boulier's fall occurred.  Although the original report recited that, after Boulier's fall, PINH installed glove dispensers in its residents' bathrooms and instructed its staff to carry gloves, that information was redacted from the report entered in evidence.[6]

[¶11]    In its opening statement, the Estate told the jury that the issues for its consideration would be the conduct of Wendy Charette and whether gloves should have been more readily available to her:

> The dispute is over . . . what was the standard of care when Wendy Charette, the CNA, discovered Vera alone by herself on the toilet. Number one, should there have been gloves already in the bathroom so she wouldn't have to leave Vera?  Number two, if gloves weren't in the bathroom, should she have had them with her?  And, number three, even if there were no gloves there in the bathroom, should the CNA have left Vera by herself even for a short period of time?
>
> . . . .

negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction.  This rule does not require exclusion of evidence of subsequent measures when offered for another purpose such as proving ownership, control or feasibility of precautionary measures, if controverted, or impeachment.

[6] Although the court's earlier order granting PINH's motion in limine only excluded the evidence related to the glove dispensers, some of the redacted material related to PINH's instruction to its staff to carry gloves.  The transcript does not reflect how the redaction was effected, and the Estate does not allege as error the breadth of the redaction.

[The defendant's expert witness] will tell you that in her opinion, it wasn't [a] deviation from the standard [of] care or it wasn't negligence for, number one, the CNA to leave the bathroom, and it wasn't negligent for them not to have gloves in the bathroom. . . . [T]hat's going to be the primary dispute that you are going to be asked to adjudicate in this case or make a decision about.

[¶12] Consistent with the Estate's opening statement, the bulk of the Estate's case-in-chief focused on these theories of negligence. However, the Estate also elicited testimony regarding the importance of clearly communicating patient care plans to CNAs. Charette testified that, at the beginning of each shift, she received a shift report indicating any changes in a patient's care plan. The Estate's expert witness, Sandra LaPorte, testified that shift reports like the one Charette described are critical to effectively communicating a patient's care plan to the CNAs on duty. LaPorte did not identify any other strategies a nursing home should employ in communicating its care plans to its staff, nor did she identify any way in which PINH deviated from the applicable standard of care when it communicated Boulier's care plan to Charette.

[¶13] At trial, the Estate also sought to revisit the issue of whether the court should exclude evidence that, shortly after Boulier's fall, PINH installed glove dispensers in the bathrooms of its residents and instructed its staff to carry gloves. Consistent with PINH's concession to the court in its earlier motion in limine, PINH's Director of Nursing testified at trial that it was feasible to install glove

dispensers in residents' bathrooms and to require staff to carry gloves. Later in the trial, when the Estate questioned Charette regarding her decision not to carry gloves, Charette responded that it was an individual decision based on her concern that carrying gloves could spread infection. Following Charette's response, the Estate argued that Charette's testimony "raises a feasibility argument that resurrects a subsequent remedial measure issue" and that the court should admit the evidence of subsequent remedial measures PINH took after Boulier's fall. The court denied the request.

[¶14] At the close of evidence, the court indicated that its jury instructions would direct the jury to focus on whether Charette was negligent in leaving Boulier alone in the bathroom while she retrieved gloves. The Estate objected, requesting an instruction that would also allow the jury to find that PINH was liable because it had negligently communicated Boulier's care plan to Charette:

> [W]e would seek to have the instruction just be general in terms of the conduct of the Presque Isle Nursing Home as the defendant, which would include Miss Charette's conduct, but also the issue of whether or not clear and concise communication of the care plan was transmitted down the line to the CNAs on the line.

The Estate did not object to the fact that the court's instruction did not encompass the Estate's other theory of the case—that PINH was liable because it should have had gloves more readily available to Charette at the time of Boulier's fall.

[¶15]   Despite the Estate's objection to the exclusion of its negligent communication theory from the instruction, the court declined to broaden the jury instruction. Relying on our decision in *Levesque v. Central Maine Medical Center*, 2012 ME 109, 52 A.3d 933, the court reasoned that the jury should not be instructed to consider the negligent communication theory of liability because the Estate did not present that theory to the prelitigation screening panel or allude to it in its notice of claim. Thus, the court instructed the jury to focus on the question of whether Charette was negligent.[7]   The jury returned a verdict in favor of PINH.

## II.  DISCUSSION

[¶16]   The Estate challenges (A) the court's exclusion of evidence of the subsequent remedial measures PINH took after Boulier's fall, and (B) the court's rejection of the Estate's proposed jury instruction related to PINH's alleged negligent communication of Boulier's care plan. We consider each contention in turn.

---

[7]   The court's instructions to the jury included the following language limiting PINH's potential liability to that which it sustained through the actions of Charette:

> The plaintiff has made a claim against the Presque Isle Nursing Home. You should understand that this claim is based upon the conduct of its employee, Wendy Charette. Under Maine law, an employer such as the Presque Isle Nursing Home is responsible for the negligent acts of its employees committed during the course of their employment. . . . In order to prevail against the Presque Isle Nursing Home . . . the plaintiff must prove that the Presque Isle Nursing Home, acting through its employee Wendy Charette, was negligent . . . . If the plaintiff fails to prove by a preponderance of the evidence that Wendy Charette was negligent, then the defendant is entitled to your verdict.

A.    Exclusion of Evidence of Subsequent Remedial Measures

[¶17]  The Estate contends that the court erred in excluding evidence that, following Boulier's fall, PINH installed glove dispensers and advised its staff to carry gloves.  The Estate contends that the court should have admitted this evidence because PINH controverted the feasibility of these measures at trial through the testimony of Wendy Charette.

[¶18]  We review a decision to exclude evidence for an abuse of discretion. *Levesque*, 2012 ME 109, ¶ 16, 52 A.3d 933.  Maine Rule of Evidence 407(a) provides that "[w]hen, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence."  However, "[t]his rule does not require exclusion of evidence of subsequent measures when offered for another purpose such as proving . . . feasibility of precautionary measures, if controverted." *Id.*

[¶19]  A defendant does not controvert the feasibility of remedial measures when, after conceding feasibility before trial, the issue arises only as a result of a plaintiff's attempt to elicit testimony on the issue.  For example, in *Albrecht v. Baltimore & Ohio Railroad Co.*, 808 F.2d 329, 331-32 (4th Cir. 1987), a defendant conceded the feasibility of remedial measures before trial, and the issue of feasibility arose only upon the plaintiff's examination of a witness.  The Court of

Appeals for the Fourth Circuit ruled that the court erred in nonetheless admitting evidence of remedial measures because feasibility was "not in issue at trial until the plaintiff began questioning the witness explicitly on these measures." *Id.* at 331. The court reasoned that "[i]t is not for the plaintiff to put feasibility in issue, for feasibility is not in issue unless and until controverted by the defendant." *Id.*

[¶20] Here, PINH conceded the feasibility of installing glove dispensers in its motion in limine. PINH further conceded feasibility at trial when its Director of Nursing testified that there was no reason why there could not have been gloves available in Boulier's bathroom or why Charette could not have had gloves with her. The only testimony that raised a question as to feasibility surfaced when the Estate elicited testimony from Charette concerning her decision not to carry gloves, to which Charette responded that her decision was a means of preventing the spread of infection. However, the Estate could not create an issue regarding the feasibility of subsequent remedial measures solely by eliciting testimony on the issue. *See id.* at 331-32; *see also Werner v. Upjohn Co., Inc.*, 628 F.2d 848, 853 (4th Cir. 1980) ("Federal Rule of Evidence 407, which enacts the common law rule excluding subsequent remedial measures to prove negligence, does, however, permit evidence of subsequent remedial measures to be used to prove the feasibility of such measures, *but only if feasibility is controverted by the defendant*." (emphasis added)). Because PINH did not controvert the feasibility of

installing glove dispensers in its residents' bathrooms or requiring that staff carry gloves, the court did not abuse its discretion by excluding, pursuant to M.R. Evid. 407, the evidence of PINH's subsequent remedial measures. *See Levesque*, 2012 ME 109, ¶ 16, 52 A.3d 933.

B.    The Court's Jury Instructions

[¶21]   The Estate also contends that it was entitled to a jury instruction on whether PINH was liable for negligently communicating Boulier's care plan to Charette.[8]  Specifically, the Estate contends that our opinion in *Levesque v. Central Maine Medical Center*, which interpreted the prelitigation screening requirement of the MHSA, did not preclude the court from issuing the instruction. *See id.* ¶¶ 17-25.   Although we agree with the Estate that the court erred in its

---

[8] We do not consider the Estate's additional contention, raised for the first time at oral argument, that it was also entitled to an instruction that would have allowed the jury to consider whether PINH was negligent in failing to have gloves more readily available to Charette at the time of Boulier's fall.  At trial, the Estate objected to the court's jury instructions solely on the ground that by instructing the jury to focus exclusively on Charette's conduct, the instructions did not permit the jury to find PINH liable for negligently communicating Boulier's care plan to Charette.  Because the objection did not direct the court to consider whether the instruction should include the issue of the availability of gloves, the issue was not preserved for appellate review. *See Morey v. Stratton*, 2000 ME 147, ¶ 9, 756 A.2d 496 ("[T]o properly preserve a challenge to a jury instruction, a party . . . must state distinctly the ground for the objection.  A failure to direct the court's attention to the challenged language of a jury instruction or to offer a more acceptable version may render the objection inadequate to preserve the issue for appeal." (quotation marks omitted)).  Similarly, on appeal, the Estate's brief was limited to the issue of whether the court should have issued a broader instruction allowing the jury to find PINH liable on a negligent communication theory, and did not raise as error the court's failure to issue an instruction that would have allowed the jury to find PINH liable for failing to have gloves more readily available.  As such, the Estate did not preserve the issue for appeal. *See Woodworth v. Gaddis*, 2012 ME 138, ¶ 13 n.6, 58 A.3d 1109 (citing *Laqualia v. Laqualia*, 2011 ME 114, ¶ 34, 30 A.3d 838, for the proposition that arguments not developed in the appellate brief are waived).

application of *Levesque*, the court did not err in refusing to instruct the jury on the theory of negligent communication.

[¶22] Before filing a complaint for professional negligence, a claimant must submit her claims to a prelitigation screening panel. *See* 24 M.R.S. § 2903(1)(B). The panel exists to encourage the early resolution of meritorious claims and the "early withdrawal or dismissal of nonmeritorious claims." 24 M.R.S. § 2851(1). The panel must hold a hearing and receive evidence, *see* 24 M.R.S. § 2854, and ultimately determine whether the plaintiff proved "negligence and proximate causation by a preponderance of the evidence," 24 M.R.S. § 2855(2)(A). If the panel's findings are unanimous and unfavorable to the defendant on both of these questions, or are unanimous and unfavorable to the plaintiff on either of them, then they are admissible as evidence in subsequent court proceedings on the claim. 24 M.R.S. §§ 2857(1)(B)-(C), 2858(2).

[¶23] In *Levesque*, we concluded that the trial court erred in permitting the jury to consider the issue of whether a particular physician was negligent, where the plaintiff acknowledged that it had not named the doctor as a defendant in its notice of claim and did not present the prelitigation screening panel with evidence that the doctor acted negligently. 2012 ME 109, ¶¶ 18-25, 52 A.3d 933. In contrast with *Levesque*, here, the Estate named PINH as a defendant in its notice of claim, and the record indicates that the Estate presented the panel with evidence in

support of its assertion that PINH was negligent. No more is required in order to preserve negligence as a basis of liability following the completion of the prelitigation screening process. Because there is no record made of proceedings before the prelitigation screening panel, a plaintiff is not required to prove that they presented a specific theory of negligence against a named defendant before the panel in order to preserve that specific theory for presentation at a latter trial.

[¶24] Nevertheless, we conclude that the court properly denied the Estate's proposed jury instruction on the theory of negligent communication, albeit for a different reason than that articulated by the court. *See L. Ray Packing Co. v. Commercial Union Ins. Co.*, 469 A.2d 832, 834 (Me. 1983) ("Where the legal reasoning of a court is incorrect, however, its judgment will be affirmed on appeal if its ultimate conclusion is correct in law."). To receive a proposed jury instruction, a plaintiff must show, among other things, that the instruction was generated by the evidence at trial. *See Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 26, 40 A.3d 955. To generate an instruction in an action for professional negligence, the plaintiff must provide sufficient evidence of "the appropriate standard of care . . . that the defendant deviated from that standard, and . . . that the deviation caused the plaintiff's damages." *Graves v. S.E. Downey Registered Land Surveyor, P.A.*, 2005 ME 116, ¶ 10, 885 A.2d 779.

[¶25]   Here, the only evidence the Estate presented at trial relating to the standard of care that a nursing home must employ in communicating its patient care plans to its staff was LaPorte's expert testimony that CNAs must receive updates when beginning a shift.   However, Charette's undisputed testimony was that she regularly received these "shift reports."   Thus, the Estate failed to provide any evidence that PINH deviated from the standard of care it owed Boulier in the manner it communicated her care plan to Charette.[9]  Because the evidence did not generate an instruction on the Estate's theory of negligent communication, there was no error in the court's refusal to instruct the jury on the issue.  *See Kezer*, 2012 ME 54, ¶ 26, 40 A.3d 955.

The entry is:

> Judgment affirmed.

_____

[9] The dissenting opinion's assertion that the negligent communication theory was otherwise generated by evidence that established the importance of the care plan overlooks the fact that the Estate did not introduce evidence that the care plan was negligently communicated to the nursing staff.  Indeed, the Estate's expert witness, Sandra LaPorte, testified that the care plan "clearly communicated" the need for the CNA to remain with Boulier in the bathroom, and there was no factual dispute that the care plan had been communicated to Wendy Charette.  Further, neither LaPorte nor any other witness was asked what the standard of care is for communicating a care plan or whether PINH violated that standard in this case.  Contrary to the dissenting opinion's characterization of the evidence, the Estate's argument at trial was that Charette failed to follow the care plan, not that it had been negligently communicated to her.

SILVER, J., with whom JABAR, J., joins, dissenting.

[¶26]  I respectfully disagree with the Court's conclusion that the trial court properly excluded evidence of subsequent remedial measures.  More importantly, I disagree with the Court's finding that the evidence presented at trial failed to generate the Estate's requested jury instruction concerning PINH's negligent communication of Vera Boulier's care plan.  The Estate presented evidence of PINH's negligence—independent of Wendy Charette's individual actions—and requested appropriate jury instructions.  The trial court denied the Estate's request for these instructions based on its misinterpretation of *Levesque v. Central Maine Medical Center*, 2012 ME 109, 52 A.3d 933, thereby precluding the jury from considering one of the Estate's most significant theories of liability.

A.      Subsequent Remedial Measures

[¶27]  First, I disagree with the Court's analysis and conclusion that the trial court did not abuse its discretion by excluding evidence that PINH instructed nurses to carry gloves following Boulier's accident.  Rule 407 permits admission of evidence of subsequent remedial measures for the purpose of demonstrating the feasibility of those measures once a party has controverted feasibility.  M.R. Evid. 407(a).   The rule also permits admission of such evidence for impeachment purposes. *Id.*

[¶28]   The Court's observation that the feasibility of requiring nurses to carry gloves was addressed and conceded before trial is simply incorrect.  PINH's motion in limine sought specifically to exclude evidence that PINH installed glove dispensers in residents' bathrooms after Boulier's fall, and indicated that the nursing home would not controvert the feasibility of mounting such dispensers.  The parties' pretrial motions contain no mention of the feasibility of instructing nurses to carry gloves.  It is therefore inaccurate to say that PINH unequivocally conceded feasibility of this remedial measure.  Consequently, *Albrecht v. Baltimore & Ohio Railroad Co.,* 808 F.2d 329 (4th Cir. 1987) is not instructive.

[¶29]   The Court also asserts that the Estate elicited the only evidence concerning infection control as a reason not to carry gloves.  Court's Opinion ¶ 20. PINH makes a similar assertion in its brief.  However, it is simply untrue.  The Estate asked Charette on direct examination whether the decision not to carry gloves was her own personal decision.  In response, she stated that she felt it was an infection control issue.   The Estate's follow-up consisted of clarifying Charette's answer and establishing that Charette made this decision on her own, without any direction from PINH.  On cross-examination, however, PINH pressed the issue, even going so far as to elicit highly prejudicial and only tangentially relevant testimony that Boulier had MRSA—an infection which PINH's counsel characterized in front of the jury as "not something you want to have"—to bolster

Charette's explanation. Once this information had been elicited, the Estate on redirect further questioned Charette about her decision not to carry gloves. It was not until Charette's entire testimony had concluded that the Estate argued to the trial court that the feasibility of the practice of carrying gloves had been controverted.

[¶30] Charette's testimony effectively controverted the feasibility of requiring nurses to carry gloves. The specific issue of infection control was first raised in a nonresponsive answer to the Estate's question about whether the decision not to carry gloves was Charette's own. Her statements were not a blanket denial of liability. On the contrary, she gave a specific explanation as to why these measures were not undertaken. Even though she testified that she made the decision without consulting any of her supervisors at PINH, her testimony indicated to the jury that, as a PINH employee, she did not carry gloves on her person because it would be unsafe to do so. PINH played a significant role in unnecessarily elaborating on this testimony, and the bulk of the Estate's questioning on the issue occurred on redirect examination. Rule 407 explicitly permits the Estate to refute Charette's assertions and to demonstrate that it would, in fact, have been feasible for nurses to carry gloves.

[¶31] At the very least, the trial court should have admitted evidence of the directive for the limited purpose of impeaching Charette. Her testimony left the

jury with the false impression that carrying gloves posed a serious health threat. PINH's swift response to Boulier's fall, directing all nurses to carry gloves with them at all times, indicates that quite the opposite is true. The prejudice resulting from this error was somewhat alleviated when one of PINH's witnesses testified that carrying gloves would not create a risk of spreading infection as long as nurses followed appropriate precautions. Nevertheless, the exclusion of evidence that PINH nurses were instructed to carry sanitary gloves soon after Boulier's fall was an abuse of discretion.

B. Jury Instructions

[¶32] As the Court explains, the trial court improperly denied the Estate's proposed jury instruction based on its misapplication of *Levesque*. I disagree, however, with the Court's conclusion that the Estate was not entitled to its requested instruction.

> On review, a party may establish entitlement to a proposed jury instruction only where the instruction was requested and not given by the court and it: (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions.

*Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 26, 40 A.3d 955 (quotation marks omitted). The Estate's proposed jury instruction states the law correctly and is not misleading or confusing. The trial court's instructions did not sufficiently cover the Estate's proposed instruction, because the court's instructions did not permit

the jury to consider PINH's liability for negligently communicating the care plan. Thus, the Estate was entitled to its proposed instruction if it requested the instruction and if the evidence presented at trial generated the instruction.

[¶33] As the Court notes in its majority opinion, the Estate clearly requested instructions involving the communication of the care plan. On the record, the Estate made the following request:

> [T]his claim of the nursing home's negligence has been there from day one. The defendant has always been the Presque Isle Nursing Home. All of the conduct that led up to Vera Boulier being left alone in the bathroom and falling has been fully litigated and should be able to be presented and argued to the panel.

[¶34] However, the Court finds that the Estate was not entitled to the requested instruction because it did not present sufficient evidence at trial to generate the instruction. Court's Opinion ¶ 25. I disagree. An instruction is generated if it "appears to be supported by the facts of the case." *Mixer v. Tarratine Mkt.,* 1999 ME 27, ¶ 6, 724 A.2d 614. As the Court discusses, to generate the requested instruction regarding PINH's professional negligence, the Estate needed to present sufficient evidence of the appropriate standard of care, evidence that the defendant deviated from that standard, and evidence that the deviation caused the plaintiff's damages. Court's Opinion ¶ 24. The facts of this case support each of these elements, at least to the extent necessary to generate the requested instructions.

[¶35]  On the issue of the appropriate standard of care, the Court notes that the Estate presented testimony that updates to a resident's care plan must be communicated to the nurses when they begin their shifts.  Court's Opinion ¶ 25.  However, this was not the only evidence of the relevant standard of care.  The Estate established at trial that PINH's Director of Nursing or another registered nurse creates a care plan for each patient based on the individual patient's needs and difficulties.  This plan is revisited and updated as the patient's needs change.  The care plan is intended to communicate the patient's needs to other nurses, including CNAs, who work with the patient.  Jeanne Delicata, PINH's expert witness, testified that it was "absolutely" critical that the care plan be clearly communicated down the line, and that the key to implementation of the care plan is clear communication of the plan to the LPNs, who are the charge nurses on each shift.  Further, she testified that it is critical that the care plan be clearly communicated so that a CNA can follow the plan without attempting to individually assess what type of care the patient requires.  This guidance is necessary because, as Sandra LaPorte, the Estate's expert witness, testified, CNAs "do not possess the education level or ability" to independently make the types of decisions provided for in the care plan.  LaPorte also testified that it is extremely important that the individual items of a care plan be clearly communicated down

the hierarchy of nurses to the CNAs who provide hands-on care, and that the daily shift report was one of the requirements in place to facilitate this.

[¶36] The Estate presented evidence from which a jury could conclude that PINH failed to meet this standard of care. Charette testified that she would refer to the actual care plan only if any changes were brought to her attention. Further, she explained that CNAs were each provided with an assignment card, which condensed specific information from the care plan, and that these cards informed her of what she needed to do as a CNA to care for the resident. Charette explained that the care plan itself contained more detailed information than was reflected on the assignment cards, and it also included information that was outside of her medical expertise. She testified that nobody ever told her specifically where she was supposed to stand or be with Boulier when Boulier was in the bathroom, and that there were no training sessions during which the care plan was explained or taught to her. It was her understanding that she was supposed to stay in the area of the bathroom because the care plan did not specify that she needed to physically stay with Boulier in the bathroom. On the other hand, LaPorte testified that the language of the care plan clearly required that a staff person needed to remain with Boulier in the bathroom.

[¶37] Based on this testimony, the jury could have concluded that the standard of care requires clear communication of the care plan, and that the care

plan required a staff person to remain in the bathroom with Boulier at all times. Charette testified that she regularly received updates when coming on shift; she also testified that these reports typically included only changes to the care plan. Further, she testified that she did not understand the care plan to require that she stay in the bathroom, that nobody ever told her where she was supposed to be when Boulier was in the bathroom, and that she had not been trained in the meaning of the care plan. From this evidence, a jury could have concluded that Charette did not understand the care plan because PINH failed to clearly communicate the meaning of the plan to her.

[¶38] Finally, this evidence was sufficient to establish a potential causal link between the alleged negligent communication of the care plan and Boulier's injuries. The Estate argued throughout the trial that Charette's distance from Boulier contributed to Boulier's fall and resulting injuries. Specifically, in its opening statement, the Estate explained:

> [I]t is critically important, you will hear, that the chain of communication from this care plan be clear and concise all the way down the line to the licensed practical nurse and the CNAs. They have to know what the care plan means and what they are supposed to do in any given situation that they come across with a patient . . . The reasonable alternative for the nurse should have been—she should have been instructed that if she found Vera in such a position, use the call bell and call button in the bathroom and call for help, have somebody come in . . . Because leaving her alone dramatically increased the risk that the inevitable was going to happen and she was going to fall.

[¶39] If the jury believed that the care plan required Charette to stay with Boulier in the bathroom, that PINH did not adequately communicate this requirement, and that Charette's distance from the bathroom resulted in Boulier's injuries, then the jury could have found PINH liable for negligent communication irrespective of whether Charette was individually at fault. However, the jury was not even allowed to consider this theory of liability because the trial court misapplied *Levesque* and inappropriately analyzed the Estate's request for the instruction concerning PINH's liability. *See* Court's Opinion ¶¶ 21-23. As a result of the trial court's error, the jury was required to review Charette's negligent conduct in isolation, disregarding a substantial portion of the Estate's case.

[¶40] The Court suggests that the Estate failed to argue at trial that the care plan had been negligently communicated. Court's Opinion ¶ 25 n.9. This observation overlooks that the trial court's ruling on jury instructions, made prior to closing arguments, foreclosed this argument. Although PINH's defense strategy was to focus exclusively on Charette's actions in the context of her relationship with Boulier, the Estate, both in its opening statement and throughout its examination of witnesses at trial, emphasized PINH's responsibility to clearly communicate the care plan. Accordingly, the Estate was entitled to its requested jury instruction.

C.     Prejudicial Error

[¶41]   Where, as here, a party properly preserves an objection to jury instructions, an error in the instruction is reversible if it results in prejudice. *Wahlcometroflex, Inc. v. Baldwin*, 2010 ME 26, ¶ 14, 991 A.2d 44.   In this case, the court's failure to provide properly requested instructions about PINH's potential liability for negligent communication of the care plan resulted in obvious prejudice to the Estate.   The trial court deprived the Estate of the opportunity to have the jury consider one of its primary arguments for liability.   In light of the limited instructions the jury received, the verdict indicates only that the jury concluded that Charette did not act negligently given the situation she was in.  *See Niedojadlo v. Cent. Me. Moving  Storage Co.*, 1998 ME 199, ¶ 6, 715 A.2d 934 ("We presume that the jury follows the trial court's instructions."); *Michaud v. Steckino*, 390 A.2d 524, 536 (Me. 1978) ("It must be presumed that the jurors were influenced in their verdict *only* by the law as given to them by the trial justice . . .") (emphasis in original).   The jury did not have occasion to consider whether PINH negligently placed Boulier in an unsafe situation by failing to adequately inform nursing staff of safety protocol.   This Court should not speculate as to how a jury would find if given the opportunity to consider a broader theory of PINH's liability, rather than a theory focused exclusively on the actions of a single CNA.

26

[¶42] The trial court improperly limited the jury instructions based on its over-reading of *Levesque*. The Estate requested appropriate instructions and presented evidence sufficient to generate those instructions. Nevertheless, the trial court denied the Estate the opportunity to have an essential component of its case considered by the jury. Accordingly, I would vacate the judgment and remand for a new trial with appropriate jury instructions on all potential theories of liability generated by the evidence.

_____

**On the briefs:**

Kenneth W. Hovermale, Esq., Hovermale Law, Portland, for appellant Estate of Vera Boulier

Christopher C. Taintor, Esq., Norman, Hanson & DeTroy, LLC, Portland, and J. William Druary, Jr., Esq., Marden, Dubord, Bernier & Stevens, P.A., LLC, Waterville, for appellee Presque Isle Nursing Home

**At oral argument:**

Kenneth W. Hovermale, Esq., for appellant Estate of Vera Boulier

Christopher C. Taintor, Esq., for appellee Presque Isle Nursing Home