MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2023 ME 48
Docket:       Yor-22-166
Argued:       February 8, 2023
Decided:      August 15, 2023

Panel:        STANFILL, C.J., and MEAD, JABAR, HORTON, CONNORS, and LAWRENCE, JJ.

## BRIAN K. SMITH

v.

## CITY OF SANFORD

STANFILL, C.J.

[¶1]  Brian K. Smith appeals from the Superior Court's (York County, *Douglas, J.*) judgment in favor of the City of Sanford following a jury trial on Smith's complaint alleging that the City violated the Maine Human Rights Act (MHRA) by discriminating against him because of a disability.  *See* 5 M.R.S. §§ 4553-A(1)(A), (C)-(D), 4571-72 (2023).  On appeal, Smith contends the court erred in rejecting his proposed jury instruction regarding a "100-percent-fit work policy."  We disagree and affirm the judgment.

### I.  BACKGROUND

[¶2]  "Viewed in the light most favorable to the jury's verdict, the evidence in the record supports the following facts."  *Darling's Auto Mall v. Gen. Motors LLC*, 2016 ME 48, ¶ 2, 135 A.3d 819.  Smith started working for the

2

Sanford Fire Department in 1981, becoming a captain in 1993. In 2014, Smith's heart rate dropped during a colonoscopy. He followed up with his primary care doctor, who discovered that Smith has a slight dilation of his aorta. The primary care doctor referred Smith to Shabbir Reza, a cardiologist, who confirmed that Smith has an enlarged, dilated aorta.[1] Reza prescribed Smith a medication to control his blood pressure and heart rate. At Smith's six-month follow-up visit, Reza concluded that Smith's aorta had not changed in size and recommended that he continue with the prescribed medication and follow up on his condition annually.

[¶3] In February 2015, Smith went to the hospital after experiencing chest pain. A scan revealed that his ascending aorta was enlarged. When Smith followed up with Reza a few weeks later, Reza confirmed that Smith's aorta was larger than previously measured and advised him to avoid heavy lifting.

[¶4] After learning of Smith's trip to the hospital, the chief of the fire department, Steven Benotti, requested that Smith provide him with a return-to-work note. Reza thereafter provided Benotti with a note stating that

---

[1] Reza used the terms *enlarged* aorta, *dilated* aorta, and *aneurysm* interchangeably at trial. He testified, however, that although these terms can be synonyms, they can also signify different diagnoses: "Sometimes you could say that it doesn't meet the strict criteria to be called as an aneurysm, but it's bigger than it should be, so we might call it dilatation."

Smith could work so long as he did not lift more than forty pounds. Benotti told Smith he could not return to work with such a restriction.

[¶5]    Smith sought a second opinion from another cardiologist, Mylan Cohen. Cohen determined that Smith had a mildly dilated ascending aorta, but that given Smith's body type, the size of his aorta could be normal or just over the limit of normal. Cohen did not place Smith on any work restrictions but advised him to avoid repetitive heavy lifting. Cohen sent Benotti a note stating that Smith could return to work with no restrictions.

[¶6]  Because the City received two differing work notes, it required Smith to see the City's occupational health doctor, Paul Upham. Benotti informed Upham that all firefighters must be able to lift 100 pounds to return to work. After evaluating Smith, Upham issued a report placing him on a seventy-five-pound lifting restriction.

[¶7]  In June 2015, Smith met with Benotti, the assistant chief, and the director of human resources because his lifting restriction prevented him from returning to work. Smith learned for the first time during that meeting of the City's requirement that all firefighters be able to lift 100 pounds. Four months later, the City sent Smith a letter terminating his employment because he was "unable to perform the required duties of [his] position as Fire Captain."

4

[¶8] In December 2017,[2] Smith filed a complaint against the City, alleging disability discrimination under the MHRA. *See* 5 M.R.S. §§ 4553-A(1)(A), (C)-(D), 4571-72. The Superior Court held a five-day jury trial in May 2022. Central to this appeal is Benotti's testimony on day four of the trial in which he testified about his discussion with Upham:

> Q: Did you—you did, however, discuss Brian's responsibilities, duties, and the physical requirements of the captain job?
>
> A: Yeah. We—we discussed the aspect that he has to come back 100 percent. We—we often say in joking when people come back from injury, you have to come back at 110 percent. But it's not the case. We have to have our people 110—100 percent so they can do the job.

On cross-examination, Benotti was asked whether "in order to come back to the fire department, a firefighter has to be 100 percent fit?" Benotti responded, "Yes." On re-direct examination, Benotti testified as follows:

> Q: So is it your position—let me ask you this first. And I'm going to ask you two separate questions for—for each question. Is it your position that Mr. Smith would have to be 100 percent fit or 100 percent healed to return to work?
>
> A: No.

---

[2] Shortly after being terminated, Smith, through his union representative, filed a grievance for wrongful termination. The City issued a decision denying Smith's grievance in December 2015. Smith then filed a complaint with the Maine Human Rights Commission. *See* 5 M.R.S. § 4611 (2023). Smith requested, and the Commission issued, a right-to-sue letter in December 2017. *See* 5 M.R.S. § 4612(6) (2023).

Q:      Is it the City's position that Mr. Smith would have to be 100 percent fit or 100 percent healed to return to work?

A:      No.

. . . .

Q:      What is it about the condition that disqualifies him from returning to work?

A:      He would have to be able to do all the essential job functions of his position as—and as a line firefighter to be able to come back to work, which includes lifting of a—the 100 pounds.

Q:      Does that mean he has to be 100 percent fit to do that?

A:      No.  Nobody's 100 percent fit.

[¶9]   In light of this testimony, Smith asked the court during an in-chambers conference to instruct the jury that "[i]t is illegal as a matter of law for any employer to impose a 100% healed or 100% fit policy on any applicants for employment or any employees."  The court met with the parties before closing arguments to review the jury instructions and verdict form.  The court's instructions did not include Smith's requested "100-percent-fit work policy" instruction.  After the court explained the instructions to the jury, the court asked the parties during sidebar whether they had any corrections or additions. At that time, Smith's attorney stated, "I understand the Court's declined to give

6

[the instruction], but I'm just renewing that for the record." The court noted this objection.

[¶10] The jury returned a unanimous verdict finding that Smith failed to prove he could perform the essential functions of his job as captain with or without a reasonable accommodation. On May 18, 2022, the court's judgment was entered in favor of the City. Smith timely appealed and contends the court erred in excluding his proposed jury instruction. M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2023).

## II. DISCUSSION

### A. Preservation of the Objection

[¶11] The City argues on appeal that Smith failed to preserve his objection to the court's instructions. "To preserve objections to instructions, a party must object before jury deliberations begin, stating distinctly the matter to which the party objects and the grounds of the objection." *Clewley v. Whitney*, 2002 ME 61, ¶ 9, 794 A.2d 87 (quotation marks omitted); *see* M.R. Civ. P. 51(b). A party's challenge to the omission of a jury instruction is preserved when the party previously requested the instruction but the court definitively denied it. *See, e.g.*, *State v. Dumond*, 2000 ME 95, ¶ 10, 751 A.2d 1014.

[¶12]   We conclude that Smith properly preserved his objection by requesting the instruction—both orally during the in-chambers meeting and in writing—which the court definitively denied.  Smith also stated the grounds for the proposed instruction, referencing Benotti's testimony during the fourth day of trial.  Smith was not required to object further because the court was sufficiently aware of his objection and had noted it for the record.

**B.    The "100-Percent-Fit Work Policy" Jury Instruction**

[¶13]  "We review jury instructions as a whole for prejudicial error, and to ensure that they informed the jury correctly and fairly in all necessary respects of the governing law."  *Darling's Auto Mall*, 2016 ME 48, ¶ 14, 135 A.3d 819 (quotation marks omitted).

> On appellate review, a party can demonstrate entitlement to a requested instruction only where the instruction was requested and not given by the court and it: (1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing; and (4) is not otherwise sufficiently covered in the court's instructions.

*Wood v. Bell*, 2006 ME 98, ¶ 20, 902 A.2d 843 (quoting *Clewley*, 2002 ME 61, ¶ 8, 794 A.2d 87); *accord Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶ 26, 40 A.3d 955. We conclude that Smith's proposed jury instruction was generated by the evidence but that it did not state the law correctly, could have misled or

8

confused the jury, and was otherwise sufficiently covered in the court's instructions.

[¶14] Smith's proposed jury instruction was generated by the evidence. *See Wood*, 2006 ME 98, ¶¶ 21-23, 902 A.2d 843. As discussed above, Benotti testified on direct examination that he told Upham that Smith "has to come back 100 percent." Then, on cross-examination, when asked whether "in order to come back to the fire department, a firefighter has to be 100 percent fit," Benotti responded, "Yes." As a result, the jury heard testimony that formed the evidentiary basis for Smith's proposed instruction. *Cf. Est. of Boulier v. Presque Isle Nursing Home*, 2014 ME 22, ¶¶ 24-25, 86 A.3d 1169; *see also Wood*, 2006 ME 98, ¶¶ 22-23, 902 A.2d 843.

[¶15] We next consider whether Smith's proposed instruction stated the law correctly or could have misled or confused the jury. *See Wood*, 2006 ME 98, ¶ 20, 902 A.2d 843. The MHRA "generally tracks federal anti-discrimination statutes."[3] *Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 20 & n.3, 168 A.3d 768

---

[3] We have acknowledged differences between the MHRA and federal anti-discrimination laws. *See, e.g.*, *Kezer v. Cent. Me. Med. Ctr.*, 2012 ME 54, ¶¶ 26-27, 40 A.3d 955 (determining that unlike federal regulations under the ADA, the MHRA does not require a good faith consultation to identify and make reasonable accommodations for the employee's disability, but rather provides covered entities with an affirmative defense). Unlike the provisions in *Kezer*, however, the relevant provisions in the ADA and MHRA here are nearly identical. *Compare* 42 U.S.C.A. § 12113(a)-(b) (Westlaw through Pub. L. No. 118-10), *and* 29 C.F.R. § 1630.2(r) (2022), *with* 5 M.R.S. § 4573-A(1), (1-A), A(3) (2023).

(quotation marks omitted); *see, e.g.*, *Me. Hum. Rts. Comm'n v. Loc. 1361, United Paperworkers Int'l Union*, 383 A.2d 369, 375 (Me. 1978). Accordingly, we have stated that "it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Carnicella*, 2017 ME 161, ¶ 20 n.3, 168 A.3d 768 (quotation marks omitted); *see Me. Hum. Rts. Comm'n*, 383 A.2d at 375 (explaining that "decisions by federal courts interpreting the federal statutory equivalents . . . provide significant guidance in the construction of our statute").

[¶16] Under the Americans with Disabilities Act (ADA), an employer policy that requires an employee to be 100 percent fit or fully healed to return to work is a per se violation of the ADA. *See McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1116 (9th Cir. 1999) (collecting cases). This is because "such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation." *Id.*

[¶17] A 100-percent-fit work policy, however, "cannot give rise to a finding of liability and relief under the ADA without the statutorily required inquiry into whether those affected by the policy are disabled and able to perform the essential functions of the jobs they seek or desire with or without

reasonable accommodation." *Gardenhire v. Manville*, 722 F. App'x 835, 840 (10th Cir. 2018) (alteration and quotation marks omitted); *see Carnicella*, 2017 ME 161, ¶ 23 & n.6, 168 A.3d 768; *see also Taylor v. Lenox Hill Hosp.*, No. 00 Civ. 3773(GEL), 2003 WL 1787118, at *2, *5-6 (S.D.N.Y. Apr. 3, 2003), *aff'd*, 87 F. App'x 786 (2d Cir. 2004) (concluding that an employee who claimed that his employer told him he needed to be "100% fit" to return to work did not have a valid ADA claim because he failed to prove that he had a disability under the ADA). In other words, a 100-percent-fit work policy is not necessarily illegal as applied to a person who is not a qualified individual with a disability under the ADA. *See* 42 U.S.C.A. §§ 12102(1), 12111(8), 12112(a) (Westlaw through Pub. L. No. 118-10).

[¶18] Like the ADA, the MHRA requires an individualized assessment to determine whether an employee can perform the essential functions of the employee's job with or without reasonable accommodations in a manner that would not endanger the health or safety of the employee or others. *Compare* 42 U.S.C.A. § 12113(a)-(b) (Westlaw through Pub. L. No. 118-10), *and* 29 C.F.R. § 1630.2(r) (2022), *with* 5 M.R.S. §§ 4573-A(1), (1-A), (3) (2023); *see also Me. Hum. Rts. Comm'n v. Can. Pac. Ltd.*, 458 A.2d 1225, 1234 (Me. 1983); *Higgins v. Me. Cent. R.R. Co.*, 471 A.2d 288, 290 (Me. 1984); *Chevron U.S.A. Inc. v.*

*Echazabal*, 536 U.S. 73, 86 (2002).  Although we have never decided whether a 100-percent-fit work policy would be a per se violation under the MHRA, we assume without deciding that Maine would follow federal law regarding such a policy.

[¶19]  Here, Smith's proposed instruction stated, "It is illegal as a matter of law for any employer to impose a 100% healed or 100% fit policy on any applicants for employment or any employees."  Because Smith's proposed instruction indicated that employers cannot legally require *any* applicants or employees to be "100% healed" or "100% fit," it was at best an incomplete statement of the law.  *See Gardenhire*, 722 F. App'x at 840; *see also Carnicella*, 2017 ME 161, ¶ 23 & n.6, 168 A.3d 768.  Furthermore, because the evidence and the parties' arguments at trial focused on the required individualized assessment, we conclude that it would have been misleading or confusing for the jury to receive Smith's proposed instruction as written.

[¶20]  The final part of the analysis is whether the court sufficiently covered the subject matter of Smith's proposed instruction in its jury instructions.  *See Wood*, 2006 ME 98, ¶ 20, 902 A.2d 843; *see also Clewley*, 2002 ME 61, ¶¶ 3, 10, 794 A.2d 87 (illustrating courts may provide jury instructions in their own words).  The court's instructions asked the jury to consider

12

whether the City had a factual basis to terminate Smith's employment based on an individualized assessment. This instruction aligned with the evidence and arguments presented at trial. By instructing the jury that the City's decision must have been supported by an individualized assessment, the instruction addressed the primary concern with 100-percent-fit work policies. *See McGregor*, 187 F.3d at 1116 (cautioning that a 100-percent-healed policy allows an employer to circumvent the required individualized assessment); *Chevron U.S.A. Inc.*, 536 U.S. at 85-86 (explaining that the individualized assessment prevents employers from relying on "untested and pretextual stereotypes"). Thus, the court's instructions adequately covered the subject matter raised in Smith's instruction.

### III. CONCLUSION

[¶21] The court did not err by rejecting Smith's proposed instruction because it did not state the law completely, had the potential to be misleading or confusing to the jury, and was otherwise sufficiently covered in the court's instructions.

The entry is:

Judgment affirmed.

Tyler J. Smith, Esq. (orally), Libby O'Brien Kingsley & Champion, LLC, Kennebunk, for appellant Brian K. Smith

Mark V. Franco, Esq. (orally), and Jeana M. McCormick, Esq., Drummond Woodsum, Portland, for appellee City of Sanford

York County Superior Court docket number CV-2017-272
<span style="font-variant:small-caps">For Clerk Reference Only</span>